## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY HAMMOND MURPHY,<br><br>Plaintiff,<br><br>v.<br><br>HAMMACHER, SCHLEMMER & CO., INC.,<br><br>Defendant. | Civil Action No. 1:23-CV-135<br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Anthony Hammond Murphy ("Murphy" or "Plaintiff") brings this action against Defendant Hammacher, Schlemmer & Co., Inc., ("Hammacher Schlemmer" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge:

## NATURE AND SUMMARY OF THE ACTION

1.      Murphy is legally blind and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*. As a result of his blindness, Murphy relies on screen access software to access digital content, like a text message, an email, or a website.

2.      Defendant is a retailer that sells apparel, accessories, and more to consumers. In order to access, research, or purchase Defendant's products and services, consumers may visit Defendant's online store, located at https://www.hammacher.com/home (the "Digital Platform").

1

3.      This action arises from Defendant's failure to make the Digital Platform compatible with screen access software, thereby denying blind individuals,[1] including Murphy, full and equal access to Defendant's products and services.

4.      The fact that Defendant's Digital Platform is inaccessible is unsurprising. In a 2011 study entitled, *Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States*, researchers explained, "[w]ith a minority of exceptions, providing accessibility is ignored in favor of faster market entrance for a product or simply because of long-standing assumptions regarding the need for accessibility and the cost of creating accessible products."[2]

5.      This exclusionary approach persists among creators notwithstanding the fact that:

> Nothing about technology makes it inherently accessible or inaccessible. Most of today's technologies are digital, meaning that they are made up of zeros and ones, and there is nothing inherently visual or auditory about zeros and ones. Digital information is not inherently accessible or inaccessible, but the choices made by those developing and implementing technology determine whether a technology will ultimately be accessible or inaccessible. This is particularly true online, given the rapid pace of technological change and introduction of new web-enabled technologies, since online technologies are often obsolete before they are made accessible.[3]

6.      Murphy files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services, and because "[i]f people with disabilities are to move from being the most disadvantaged

---

[1] Murphy uses the word "blind" to describe individuals who, as a result of a visual impairment, have substantially limited eyesight. This includes individuals who have no vision or who have low vision. *See* James H. Omvig, *Why Use the Word "Blind"?*, Braille Monitor (Jan. 2009), https://nfb.org/sites/default/files/images/nfb/publications/bm/bm09/bm0901/bm090107.htm.

[2] Brian Wentz, Paul T. Jaeger, and Jonathan Lazar, *Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States*, First Monday, Vol. 16, No. 11 (Nov. 7, 2011), available at https://firstmonday.org/ojs/index.php/fm/article/download/3666/3077.

[3] *Id.*

population online to equal residents of cyberspace,"[4] we must reject the mentality of retrofitting in favor of a philosophy that emphasizes the design and development of technology that is inclusive of people with disabilities from launch.

7.    Accordingly, Murphy seeks an order requiring that Defendant make its Digital Platform accessible and adopt sufficient policies and practices to ensure the Digital Platform does not become inaccessible again in the future.

## JURISDICTION AND VENUE

8.    The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

9.    Defendant attempts to, and indeed does, participate in the Commonwealth's economic life by offering and providing products and services over the internet to Pennsylvania residents, including Murphy. Unlike, for example, a winery that may not be able to sell and ship wine to consumers in certain states, Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Pennsylvania residents.[5]

---

[4] *Id.*

[5] *See Gniewkowski v. Lettuce Entertain You Enters.*, No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa Apr. 25, 2017), *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (*citing Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997) (exercising specific personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum hotel operator)); *Law School Admission Council, Inc. v. Tatro*, 153 F. Supp. 3d 714, 720-21 (E.D. Pa. 2015) (exercising personal jurisdiction over out-of-forum website operator); *Access Now Inc. v. Otter Products, LLC*, 280 F. Supp. 3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F. Supp. 3d 296 (D. Mass. 2018) (same).

10.    These online interactions between Defendant and Pennsylvania residents involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the internet in Pennsylvania.

11.    Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located in Pennsylvania every time a Pennsylvania resident visits the Digital Platform.[6]

12.    Murphy was injured when he attempted to access the Digital Platform from Erie, Pennsylvania, but encountered communication barriers that denied him full and equal access to Defendant's online products, content, and services.

13.    Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Murphy's claims occurred.

## PARTIES

14.    Murphy is a natural person over the age of 18. He resides in and is a citizen of Erie, Pennsylvania, located in Erie County.

15.    He graduated from Edinboro University with a degree in sociology in 1999 and today he works for the Commonwealth of Pennsylvania.

---

[6] A. Benjamin Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts*, 2006 U. Ill. L. Rev. 71, 95 n.156 (2005), http://illinoislawreview.org/wp-content/ilr-content/articles/2006/1/Spencer.pdf (citations omitted) ("A cookie is a message given by a Web server to a computer's Web browser. The primary purpose is to identify users and prepare customized Web pages for them. A persistent cookie is 'a cookie that is stored on a user's hard drive until it expires . . . or until the user deletes the cookie. Persistent cookies are used to collect identifying information about the user, such as Web surfing behavior or user preferences for a specific Web site.'").

16.     Murphy has advocated for blind individuals his entire life.[7]

17.     The United States District Court for the Western District of Pennsylvania appointed Murphy as class representative in a class action case substantially similar to this individual action. *Murphy v. Charles Tyrwhitt, Inc.*, No. 1:20-cv-00056, 2020 U.S. Dist. LEXIS 222540, at *9, *34 (W.D. Pa. Nov. 25, 2020), *report and recommendation adopted by* 2021 U.S. Dist. LEXIS 144 (W.D. Pa. Jan. 4, 2021) ("Based on the above, the Court finds that Anthony Hammond Murphy and Blair Douglas [sic] will fairly and adequately represent the class as representative Plaintiffs and that their proposed class counsel will fairly and adequately protect the interests of the class and provide capable legal representation. The adequacy requirement of Rule 23(a) is satisfied.").

18.     Defendant is a Illinois corporation with a principal place of business in New York.

19.     Defendant owns, operates, and/or controls its Digital Platform and is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.

## STANDING UP FOR TITLE III OF THE ADA

20.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited

---

[7] *How did Erie plow crews do?: Your view from Facebook*, GoErie.com (Jan. 7, 2018), https://www.goerie.com/opinion/20180107/how-did-erie-plow-crews-do-your-view-from-facebook ("Anthony Hammond Murphy: As a visually impaired person, I find it very difficult to cross streets via curb cuts due to the snow and ice being plowed into these corners. The plow drivers should be allowed to triangulate and get the corners as well, and not just go north-south and east-west.").

access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[8]

21.     More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[9] and private individuals[10] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[11]

22.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[12] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[13]

23.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[14]

---

[8] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[9] 42 U.S.C. § 12188(b).

[10] 42 U.S.C. § 12188(a).

[11] Johnson, *supra* note 8.

[12] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[13] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).

[14] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

24.     Courts recognize this dynamic too.

[Defendant] also points to the number of cases filed by the same plaintiff in this jurisdiction. Counsel have filed nine cases in this jurisdiction on behalf of [the plaintiff]. I am not impressed by this argument. If the ADA were enforced directly by the government, as are, for example, the fair housing laws, it is likely that government lawyers would have reached out to disabled individuals — "testers" as they are called — to find out which businesses were complying and which were not. [The named plaintiff] has functioned here as a "tester," which is entirely appropriate.[15]

25.     Consistent with these policies, Murphy files this case to ensure Defendant provides full and equal access to consumers with disabilities.

## <u>SUBSTANTIVE ALLEGATIONS</u>

### Defendant's Accessibility Policies and Inaccessible Digital Platform

26.     Two of the most commonly used screen reader auxiliary aids are JAWS from Freedom Scientific (available on Windows computers) and VoiceOver (available on macOS and iOS devices).[16]

27.     "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer

---

[15] *Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 194 (D. Mass. 2013) (Young, J.) (*quoting Iverson v. Braintree Prop. Assocs., L.P*., No. 04-cv-12079-NG, 2008 WL 552652, at *3 n.5 (D. Mass. Feb. 26, 2008) (Gertner, J.)); *see also Murphy v. Bob Cochran Motors, Inc.*, No. 1:19-cv-00239, 2020 U.S. Dist. LEXIS 139887, at *15-16 (W.D. Pa. Aug. 4, 2020), *adopted by Murphy v. Bob Cochran Motors, Inc*., 2020 U.S. Dist. LEXIS 177593 (W.D. Pa., Sept. 28, 2020) (upholding tester standing in a substantially identical ADA website accessibility case).

[16] *See Screen Reader User Survey #9 Results,* WebAIM, webaim.org, https://webaim.org/projects/screenreadersurvey9/ (last accessed Apr. 3, 2023).

applications on your PC. You will be able to navigate the Internet, write a document, read an email

and create presentations from your office, remote desktop, or from home."[17]

28.     "VoiceOver is an industry-leading screen reader that tells

you exactly what's happening on your device. VoiceOver can now

describe people, objects, text, and graphs in greater detail than ever.

Auditory descriptions of elements help you easily navigate your screen

through a Bluetooth keyboard or simple gestures on a touchscreen or

trackpad. And with unique rotor gestures that function like a dial on

touchscreens and trackpads, you can make content such as websites a

breeze to browse."[18]



29.     Here is an example of

another online store's successful use of

audio descriptions to communicate its

products to screen reader users.[19] The

image on the left illustrates what shoppers

perceive visually when browsing the

online store with an iPhone. To the right




is an image from the online store with the audio description highlighted for that image in green.

Although invisible to the eye, screen access software reads this highlighted text aloud in order to

describe the image to shoppers who cannot perceive content visually. In this example, when

---

[17] *JAWS®*, Freedom Scientific, https://www.freedomscientific.com/products/software/jaws/ (last accessed Apr. 3, 2023).

[18] *See Accessibility*, Apple, https://www.apple.com/accessibility/vision/ (last accessed Apr. 3, 2023).

[19] *See* Custom Ink, Homepage, https://www.customink.com/ (last accessed Mar. 28, 2019).

shoppers tab to the image file with a screen reader, the online store announces, "One burlap and cotton tote bag with a custom printed architectural company logo." Blind shoppers require audio descriptions, frequently called "alternative text," like this to access digital content fully, equally, and independently.

30.    Unfortunately, because of Defendant's failure to build the Digital Platform in a manner that is compatible with screen access software, Murphy is unable to fully and equally access Defendant's products and services.

31.    As a result of visiting the Digital Platform, and from investigations performed on his behalf, Murphy found that Defendant fails to communicate information effectively because screen reader auxiliary aids cannot access important content on the Digital Platform. Click the links at the end of each subparagraph to watch a short video illustrating some of the extant communication barriers on Defendant's Digital Platform. These links, and the following examples, in no way define the entire realm of barriers that deny Murphy fully and equal access to Defendant's Digital Platform:

(a)    Defendant prevents screen reader users from accessing some primary content. For example, when consumers visit the Digital Platform from a new IP address, Defendant displays a pop-up window containing an offer for "SAVE $10 on your next purchase over $99 when you sign up for Hammacher when you sign up for Hammacher Emails" Consumers who perceive content visually will click this pop-up to either sign up for the promotional offer, or to close the offer. Unfortunately, Defendant does not alert screen readers of this pop-up window. Instead, screen readers remain focused on the content of the Digital Platform's underlying page, making the pop-up invisible to screen reader users. As a result, it is impossible for Plaintiff to perceive this promotion independently, the effect of which would require him to pay more on his

order than consumers who do not use screen reader technology to shop online. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/mXbI1oqhhGA

(b)     Defendant allows consumers to pay for their purchase in installments. Consumers who wish to learn more about installment payments may click a button to learn more about the payment plan, at which time Defendant will display a pop-up window on the screen. Consumers who perceive content visually can access the pop-up window to learn about interest, payment schedules, and other information. Unfortunately, Defendants fail to notify screen readers of the installment purchase option Instead, screen readers remain skip over this content making this installment option unavailable to the Plaintiff. As a result, it is impossible for Plaintiff to perceive the information he needs before choosing an installment option. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/NNPZTJlZRoQ

(c)     Defendant's Digital platform has inaccurate audio descriptions for products on the Defendant's Digital Platform. For example, when navigating through products on the Digital Platform a customer will see a product called a "six-foot kick ball dart board" with the foot being designated by the symbol ""' this symbol for a visual user is easily perceived as the symbol for the measurement foot or feet. Unfortunately, screen reader users such as the Plaintiff are not able to perceive this content visually and require the assistance of an auxiliary aid like VoiceOver to allow them to perceive content. Instead, screen readers do not recognize this symbol and reads the product description as the "six kickball dart board" this small but significant barrier changes the complete meaning of the product instead of the plaintiff knowing that this product is six feet in height he is led to believe that the product is a dart board that comes with six kickballs. This

barrier can lead the Plaintiff to purchase a product that otherwise he may or may not have purchase had he known the true size of the product. Or it can lead for screen reader users like the Plaintiff to become confused and abandon purchasing from   Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/qPqGSwovQuY

(d)    Defendant does not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, the Digital Platform provides a five-star rating for many products that Defendant sells. Consumers who perceive content visually can see whether a particular product has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Defendant's accessibility policies fail to provide sufficiently descriptive alternative text for this important rating information. To this end, screen readers do not provide sufficient audio information when they hover over the stars on the Digital Platform. Here, the screen reader reads aloud the number of reviews but does not provide any additional information or context from which screen reader users may determine its significance or meaning. As a result, Plaintiff must make his purchasing decisions without the benefit of knowing whether the products he's researching are well received by other consumers. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/5-5MIocj6VY

(e)    Defendant uses visual cues as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element. Providing information conveyed visually through another means is necessary to ensure that consumers who cannot perceive visual cues can still perceive important information in a non-visual manner. For example, the Digital Platform allows consumers to select the size of the product they wish to

purchase. Defendant identifies the selected size visually by filling in the box of the color a shopper selects. Unfortunately, Defendant fails to include alternative text to identify this selection in a non-visual means. This makes it difficult and frustrating, if not impossible, for Plaintiff to verify what size he selected, if any. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/qvfl1tY6Azc

(f)    Defendant have buried an Accessibility Statement in the footer of the Digital Platform, where screen reader users, like Plaintiff, are unlikely to discover it. Imagine having to tab to the last cell in a spreadsheet but not knowing how long that would take or whether the information you seek (i.e., the Accessibility Statement) even exists. Then imagine many of the preceding cells contain unintelligible information (i.e., the access barriers described herein) you must sift through first. This pursuit frustrates screen reader users' online experience such that they are likely to abandon the process before discovering the Accessibility Statement or using the contact information it may include. Click the following link to view a short video demonstrating this access barrier: https://youtu.be/fQkPYRgWPko

**Plaintiff's Injury**

32.    The access barriers described above, and others, deny Murphy full and equal access to the Digital Platform today.

33.    These barriers, together with Defendant's insufficient policies and practices, also humiliate and deter Murphy from returning to the Digital Platform, where he cannot help but feel second-class.

34.    Still, Murphy intends to attempt to access the Digital Platform within the next six months to determine if it is accessible and, if so, to potentially explore the community, products, and services Defendant offers at that time.

**Defendant's Digital Platform Must Comply with the ADA**

35.    Since its enactment in 1990, the ADA has clearly stated that covered entities must provide "full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommodations" to people with disabilities,[20] and must "ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[21]

36.    DOJ first announced its position that Title III applies to websites of public accommodations in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator Tom Harkin regarding the accessibility of websites to blind individuals.[22]

37.    In 2000, DOJ argued to the Fifth Circuit that a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability.[23]

38.    In 2002, DOJ argued to the Eleventh Circuit that there need not be a nexus between a challenged activity and a private entity's "brick-and-mortar" facility to obtain coverage under Title III. DOJ argued that Title III applies to any activity or service offered by a public accommodation, on or off the premises.[24]

---

[20] 42 U.S.C. § 12182(a).

[21] 42 U.S.C. § 12182(b)(2)(A)(iii).

[22] Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996), https://www.justice.gov/crt/foia/file/666366/download (last accessed Apr. 3, 2023).

[23] Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, No. 99-50891 (5th Cir. June 30, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf (last accessed Apr. 3, 2023) ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

[24] Brief for the United States as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Productions, Inc.*, No. 01-11197, 294 F.3d 1279 (11th Cir. 2002), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/rendon.pdf (last accessed Apr. 3, 2023).

39.     In 2014, DOJ entered into a settlement agreement with America's then-leading internet grocer to remedy allegations that its website was inaccessible to some individuals with disabilities.[25]

40.     In a 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed: "[t]he Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities."[26]

41.     In 2019, the United States Supreme Court declined to review a Ninth Circuit decision holding that Title III covers websites and mobile applications.[27]

42.     In 2022, DOJ published "Guidance on Web Accessibility and the ADA," reiterating that DOJ "has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."[28]

## **SUBSTANTIVE VIOLATION**

### **Title III of the ADA, 42 U.S.C. § 12181 *et seq.***

---

[25] *See* Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, DJ 202-63-169 (Nov. 17, 2014), https://www.justice.gov/file/163956/download (last accessed Apr. 3, 2023).

[26] *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018), https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf (last accessed Apr. 3, 2023).

[27] *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019), *cert. denied* 140 S. Ct. 122 (2019) (No. 18-1539).

[28] Civil Rights Division, Department of Justice, *Guidance on Web Accessibility and the ADA* (Mar. 18, 2022), https://beta.ada.gov/resources/web-guidance/ (last accessed Apr. 3, 2023).

43. The assertions contained in the previous paragraphs are incorporated by reference.

44. Murphy is an individual with a "disability." With respect to an individual, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A). The ADA defines "major life activities" to include, in relevant part, "seeing[.]" 42 U.S.C. § 12102(2)(A). Because Murphy is blind, he meets Title III's definition of an individual with a disability.

45. Defendant operates a place of public accommodation under Title III. Title III defines a "public accommodation" as including a "sales or rental establishment" and/or "other service establishment[.]" 42 U.S.C. § 12181(7)(E), (F). Because Defendant provides goods and services to the general public, it meets Title III's definition of a place of public accommodation.

46. Title III begins with a general rule that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

47. The statute contains several general prohibitions, including a prohibition against "denying an individual on the basis of a disability 'the opportunity . . . to participate in or benefit from the goods [or] services' of a public accommodation." 42 U.S.C. § 12182(b)(1)(A)(i).

48. These general prohibitions are supplemented by several specific prohibitions, including an auxiliary aids and services requirement, which requires public accommodations to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

49.     The United States Department of Justice ("DOJ") has issued regulations implementing the ADA, including the auxiliary aid and service requirement.

50.     These regulations define "screen reader software," like what Murphy used to attempt to access the Digital Platform, as being a covered "auxiliary aid and service." 28 C.F.R. § 36.303(b)(2).

51.     The regulations also include an effective communication requirement, which requires public accommodations to "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1).

52.     DOJ has issued regulatory guidance noting that the duty to provide effective communication with customers is implicit in the duty of a public accommodation to provide auxiliary aids and services. Appx. A to Part 36 - Guidance on Revisions to ADA Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and Commercial Facilities.[29]

53.     DOJ also has issued a Technical Assistance Publication, which provides guidance on communicating effectively with individuals who have vision, hearing, or speech disabilities. Dep't of Justice, ADA Requirements: Effective Communication (Jan. 2014).[30] This publication requires the provision of "information technology that is accessible (either independently or through assistive technology such as screen readers)." *Id.*

---

[29] This guidance is available at https://www.ecfr.gov/current/title-28/chapter-I/part-36/appendix-Appendix%20A%20to%20Part%2036 (last accessed Apr. 3, 2023).

[30] This guidance is available at http://www.ada.gov/effective-comm.htm (last accessed Apr. 3, 2023).

54.    Defendant has violated Title III's general anti-discrimination mandate and effective communication requirement by failing to ensure the Digital Platform is fully and equally accessible through screen reader auxiliary aids.

55.    This unequal access also humiliates and deters Murphy from attempting to access the Digital Platform, forcing him to wait until Defendant elects to retrofit the Digital Platform to be accessible.

## PRAYER FOR RELIEF

WHEREFORE, Murphy requests judgment as follows:

(A)    A declaratory judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure Murphy could fully, equally, and independently access Defendant's online community, products, and services;

(B)    A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to ensure its products and services are fully, equally, and independently accessible to Murphy, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following policies and practices that will cause Defendant to remain in compliance with the law— the specific injunctive relief requested by Plaintiff is described more fully below;

(1)    Within 90 days of the Court's order, Defendant shall complete an accessibility audit of its Digital Platform that will examine the accessibility and usability of the Digital Platform by consumers who are blind.

(2)     Within 180 days of the Court's order, Defendant shall develop a corrective action strategy ("Strategy") based on the audit findings. In addition to the deadlines outlined below, the Strategy shall include dates by which corrective action shall be completed.

(3)     Within 210 days of the Court's order, Defendant shall disseminate the Strategy among its executive-level managers, employees, and contractors, if any, involved in digital development and post it on the Digital Platform.

(4)     Within 90 days of the Court's order, Defendant shall develop a Digital Accessibility Policy Statement that demonstrates its commitment to digital accessibility to blind and other print disabled consumers, as required by the Americans with Disabilities Act. This Policy Statement shall be posted in the header of each homepage on the Digital Platform within 120 days of the Court's order, and shall disclose that an audit is taking or has taken place and that a Strategy will be disseminated and posted on the Digital Platform within 180 days of the Court's order.

(5)     Within 240 days of the Court's order, Defendant shall develop procedures to implement its Digital Accessibility Policy across the entire Digital Platform. Defendant shall disseminate its Policy and procedures to its executive-level managers, employees, and contractors, if any, involved in digital development.

(6)     Within 12 months of the Court's order, Defendant shall conduct training, instruction and support to ensure that all executive-level managers and employees involved in digital development are aware of and understand the Digital Accessibility Policy, including proper procedures, tools, and techniques to implement the Digital Accessibility Policy effectively and consistently.

(7)     Within 12 months of the Court's order, Defendant shall hire or designate a staff person with responsibility and commensurate authority, to monitor the Digital Accessibility Policy and procedures.

(8)     Within 12 months of the Court's order, Defendant shall develop and institute procedures that require third-party content and plug-ins built into the Digital Platform to provide blind consumers the same programs, benefits and services that they do to individuals without disabilities, except when it is technically unfeasible to do so. Defendant shall effectuate these obligations by, among other things, implementing as part of its Request for Proposal process language that bidders meet the accessibility standards set forth in WCAG 2.1 Level AA for web-based technology and the Americans with Disabilities Act; requiring or encouraging, at Defendant's discretion, as part of any contract with its vendors, provisions in which the vendor warrants that any technology provided complies with these standards and any applicable current federal disability law.

(9)     Within 18 months, all pages hosted on the Digital Platform that have been published shall be Accessible to blind users. "Accessible" means fully and equally accessible to and independently usable by blind individuals so that blind consumers are able to acquire the same information, engage in the same interactions, and enjoy the same services as sighted consumers, with substantially equivalent ease of use.

(10)     Defendant shall not release for public viewing or use a substantial addition, update, or change to the Digital Platform until it has determined through automated and end-user testing that those proposed additions, updates, or changes are Accessible.

(11)     Defendant shall conduct (a) an automated scan monthly and (b) end-user testing quarterly thereafter to ascertain whether any new posted content is Accessible. Defendant

shall notify all employees and contractors, if any, involved in digital development if corrections to the Digital Platform are needed and of reasonable timelines for corrections to be made. Defendant shall note if corrective action has been taken during the next monthly scan and quarterly end-user test.

(12)     Following the date of the Court's order, for each new, renewed, or renegotiated contract with a vendor of third-party content, Defendant shall seek a commitment from the vendor to provide content in a format that is Accessible.

(13)     Defendant shall provide Plaintiff, through his counsel, with a report on the first and second anniversaries of the Court's Order which summarizes the progress Defendant is making in meeting its obligations. Additional communication will occur before and after each anniversary to address any possible delays or other obstacles encountered with the implementation of the Digital Accessibility Policy.

(C)     Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment;[31]

---

[31] *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987); *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11); Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, No. 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

(G)     An order retaining jurisdiction over this case until Defendant has complied with the

Court's orders.

Dated: MAY 9, 2023                              /s/ Lawrence H. Fisher
                                    ────────────────────────────────
                                    Lawrence H. Fisher
                                    Pa. No. 67667
                                    One Oxford Centre
                                    301 Grant Street, Suite 270
                                    Pittsburgh, PA 15219
                                    Tel. (412) 577-4040
                                    lawfirst@lawrencefisher.com

---

accessed Apr. 3, 2023) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case).